IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-550-05 |
| STEVEN NORTHINGTON | : | |


**SURRICK, J.**                                                                                    **MAY 6, 2014**

## MEMORANDUM

Presently before the Court is Defendant Steven Northington's Motion for a New Trial
(ECF No. 1546).  For the following reasons, Defendant's Motion will be denied.

## I.     BACKGROUND

On May 13, 2013, a jury found Defendant Steven Northington guilty of conspiring to
participate in the affairs of a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) ("RICO
conspiracy"), and of two counts of murder in aid of racketeering, in violation of 18 U.S.C. §
1962(a)(1).  (Verdict Sheet, ECF No. 1330 (filed under seal).)  Defendant was tried along with
three co-Defendants:  Kaboni Savage; Robert Merritt; and Kidada Savage.  Defendant now
moves for a new trial, contending that the Court erred on multiple grounds.

### A.     The Indictment

The seventeen-count Fourth Superseding Indictment was returned on May 9, 2012,
charging Defendant and his co-Defendants with various crimes relating to a RICO conspiracy
involving drug trafficking, murder, and witness intimidation.  (Fourth Superseding Indictment
("Indictment"), ECF No. 480.)[1]  Count 1 of the Indictment, the RICO conspiracy count, charged

---
[1] On March 11, 2011, the Government filed a notice of intent to seek the death penalty
against Defendant and his co-Defendants, Kaboni Savage and Robert Merritt.  (*See* ECF Nos.
196, 197 and 198.)

all Defendants with conspiring to participate in the affairs of a racketeering enterprise, which is referred to in the Indictment as the Kaboni Savage Organization ("KSO"). The Indictment alleged that from late 1997 through April 2010, the KSO conspired and agreed to commit racketeering acts, such as murder, dealing in controlled substances, arson, witness tampering, and money laundering. (Indictment ¶ 1(a)-(f).) The Indictment states that Defendants and others were "members of a regional criminal organization" that "maintained control of its drug distributions, and its exclusive control of its drug corners, through a pattern of threats, intimidation, violence, and murder. (*Id*. at ¶¶ 2, 5.)

The Indictment sets forth the roles that each of the Defendants played with respect to the enterprise, and states that Defendant "was a drug distributor, drug corner boss, enforcer and assassin for the KSO." (*Id*. at ¶ 12(c).) The Indictment further states that Defendant "participated in murders, the distribution of controlled substances, carrying firearms during violent crimes, witness tampering, and witness retaliation." (*Id*.) The Indictment sets forth 140 paragraphs of overt acts that were alleged to have been committed by Defendants "[i]n furtherance of the conspiracy, and to effect the objects and purposes" of the conspiracy. (*Id*. at ¶14(1)-(140).) Many of the overt acts describe events involving co-conspirators and Defendant's co-Defendants. The overt acts involving Defendant relate to: the distribution of controlled substances; the murder of Barry Parker in February of 2003; the murder of Tybius Flowers in February of 2004, which was allegedly committed to prevent Flowers from testifying against Kaboni Savage in a state court murder trial; and the threatening of a co-conspirator and cooperating witness during a federal drug conspiracy trial. (*Id*. at ¶¶ 32-39, 46, 54-55, 126.)[2]

---

[2] Savage, Northington, and four other co-defendants not charged in the instant Indictment were prosecuted in the 2005 federal drug conspiracy case before the Honorable Mary A. McLaughlin. After a seven-week trial, Defendant was found guilty of conspiracy to manufacture and distribute cocaine and cocaine base, and possession of a firearm as a convicted felon. *See*

### B. Pretrial Motions

Over seventy pretrial motions were filed in this case. Countless other motions were filed during the trial. Many of the motions dealt with issues related to capital punishment, while others addressed evidentiary issues, sufficiency of the Indictment, trial procedure, the jury selection process, and discovery. In the instant Motion, Defendant takes issue with the Court's ruling on five of those motions: (1) the motion to sever; (2) the motion to suppress evidence; (3) the motion to preclude prior bad acts evidence; (4) the motion to secure the jury from the county of offense; and (5) the motion to increase the pool of prospective jurors and strike the current jury panel. We address, briefly, the procedural history of each of these motions.

On February 17, 2012, Defendant filed a motion to sever his trial from the trial of his co-Defendants. (Def.'s Severance Mot., ECF No. 363.) On April 5, 2012, the Government filed an omnibus response to all of Defendants' motions to sever, including Northington's. (ECF No. 450.) On December 18, 2012, the Court filed a Memorandum and Order denying Defendants' motions to sever. (Severance Mem., ECF No. 846; Severance Order, ECF No. 847.)

On February 21, 2012, Defendant filed a motion to suppress physical evidence seized from 3908 North Franklin Street. (ECF No. 401.) On April 16, 2012, the Government filed an omnibus response in opposition to Defendants' motions to suppress physical evidence obtained pursuant to valid search warrants. (ECF No. 466.) On January 23, 2013, Defendant filed a memorandum in further support of his motion to suppress physical evidence. (ECF No. 934 (filed under seal).) The Government filed a response to Defendant's memorandum that same day. (ECF No. 936.) On January 30, 2013, the Court filed a Memorandum and Order, both

---

*United States v. Savage,* No. 04-269 (E.D. Pa.), at ECF Nos. 448, 717. Defendant is serving a sentence of 235 months imprisonment for those crimes. *See Savage*, 04-269, at 895. Defendant is also serving a life sentence as a result of a state court conviction for the murder of Barry Parker.

under seal, denying Defendant's motion to suppress.  (Suppress Mem., ECF No. 983 (filed under seal); Suppress Order, ECF No. 984 (filed under seal).)

On December 17, 2012, the Government filed a notice of potential prior bad acts evidence pursuant to Federal Rule of Evidence 404(b).  (ECF No. 828.)  The evidence related to an arrest of Defendant that occurred on September 8, 2004.  On January 16, 2013, Defendant filed a motion to strike this notice and to preclude the evidence from being admitted at the trial.  (ECF No. 910.)  The Government filed a response to Defendant's motion to strike on January 1, 2013.  (ECF No. 921.)  On February 1, 2013, we filed a Memorandum and Order denying Defendant's motion to strike.  (404(b) Mem., ECF No. 1023; 404(b) Order, ECF No. 1024.)

On February 21, 2012, Defendant filed a motion to secure the jury from the county of offense, pursuant to 18 U.S.C. § 3235 (ECF No. 403) and a motion to increase the pool of eligible jurors (ECF No. 406).  On April 10, 2012, the Government filed a response to both of these motions.  (ECF No. 457.)  On October 2, 2012, we filed a Memorandum and Order denying Defendant's motion to secure the jury from the county of the offense.  (County Mem., ECF No. 639; County Order, ECF No. 640.)  On November 6, 2012, Defendant filed another motion to increase the pool of prospective jurors, and to strike the current jury panel.  (ECF No. 701.)  On January 28, 2013, a Memorandum and Order was entered denying Defendant's motion.  (Juror Mem., ECF No. 969; Juror Order, ECF No. 970.)

### C.    Jury Selection

Jury selection began on September 27, 2012 and lasted until January 29, 2013.  Selecting and empaneling a jury in any capital case involves significant time and effort because prospective jurors must be carefully screened to ensure that they can maintain impartiality in their views about capital punishment.  In addition, because of the nature of this case, the parties

predicted that the case would last many months. It was therefore necessary to ensure that the prospective juror was capable of committing to sit through the guilt phase and penalty phase of this multi-Defendant capital trial. It was determined prior to jury selection that the process for empaneling a jury would remain anonymous due to concerns about the safety of jurors.[3] Approximately 1,130 jurors were initially summoned to fill out extensive jury questionnaires that included questions about their backgrounds, possible hardship concerns, attitudes about the death penalty, and general views about aspects of the criminal justice system. Counsel for all parties reviewed the questionnaires and agreed to strike many of the jurors for hardship and for cause. The remaining approximately 350 jurors returned for individual *voir dire*, scheduled over the course of several weeks. The jury that was ultimately selected consisted of twelve jurors and six alternate jurors. Two of the selected jurors and one alternate juror were African American.

### D. The Trial, Conviction, and Verdict[4]

Opening statements began on February 4, 2013. The trial lasted approximately fourteen weeks. During the trial, the Government presented over 70 witnesses, over 1000 exhibits, and numerous intercepted Title III wiretap conversations. All of this evidence was used to develop the Government's theory that Defendants, together with other co-conspirators, participated in an overarching RICO conspiracy involving drug distribution, murder, arson, witness tampering, and

---

[3] By Memorandum and Order dated September 14, 2012, we determined that an anonymous jury was appropriate. (*See* ECF Nos. 601, 602.)

[4] Defendant does not raise a sufficiency of the evidence argument in the instant post-trial motion seeking a new trial. Instead, Defendant contends that the Court erred in denying multiple pretrial motions, failing to grant a mistrial as a result of alleged prosecutorial misconduct, and denying Defendants' *Batson* challenges to two jurors struck by the Government. Because Defendant does not raise a sufficiency of the evidence argument, it is not necessary to provide a detailed account of the facts and evidence presented at trial. When certain facts are required to rule on Defendant's claims, we include those relevant facts in the section of this Memorandum addressing the particular claim.

witness retaliation. Although not all of the evidence and testimony related specifically to Defendant, there was substantial evidence that permitted the jury to determine Defendant's involvement in the RICO conspiracy. The evidence and testimony, as it related to Defendant, centered on his drug distribution activities, the murder of Barry Parker, the murder of Tybius Flowers, and Defendant's September 8, 2004 arrest in North Philadelphia. A significant amount of the trial evidence related to the October 9, 2004 firebombing of the home of Eugene Coleman, a former associate of Kaboni Savage. Suspicious that Coleman was cooperating with the Government, Savage directed co-conspirator and cooperating witness, Lamont Lewis, to set fire to Coleman's home. Lewis solicited the assistance of his cousin, co-Defendant Robert Merritt. Lewis was charged in the First Superseding Indictment; however, the charges against Lewis were disposed of by guilty plea on April 21, 2011. The firebombing took the lives of Coleman's mother, infant son, and four other relatives. At trial, the Government established that the firebombing was ordered by Savage, with the assistance of his sister, Kidada Savage, to intimidate Coleman from testifying against him at the 2004 drug conspiracy trial. Defendant was not charged in the six murder counts in the Indictment related to the firebombing, and the Government never alleged that Defendant was in any way involved in the arson murders that took place on October 9, 2004.

On May 13, 2013, the jury returned its verdict in the guilt phase of the trial. The jury found Defendant guilty of RICO conspiracy (Count 1), the murder of Barry Parker in aid of racketeering (Count 5), and the murder of Tybius Flowers in aid of racketeering (Count 7). (Verdict Sheet; Min. Entry, ECF No. 1329.)[5]

---

[5] Kaboni Savage was found guilty on all counts: RICO conspiracy; twelve counts of murder in aid of racketeering; conspiracy to commit murder in aid of racketeering; witness retaliation; and using fire to commit a felony. (Verdict Sheet.) After a penalty phase hearing, the same jury that determined Savage's guilt sentenced Kaboni Savage to death on thirteen

As part of their verdict, the jury made special findings in accordance with *Apprendi v. New Jersey*, 530 U.S. 466 (2000). These findings were required to determine the potential maximum sentence Defendant faced for the RICO conspiracy conviction. The jury found unanimously, beyond a reasonable doubt, that the following sentencing factors were proven as to Defendant:

Special Sentencing Factor #5: The Barry Parker Murder

On or about February 26, 2003, in Philadelphia, in the Eastern District of Pennsylvania, the defendants, KABONI SAVAGE and STEVEN NORTHINGTON, knowingly and intentionally murdered, knowingly aided and abetted, and willfully caused the murder of, and aided, agreed, or attempted to aid, and solicited another to commit, the murder of Barry Parker, a human being, in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 2502(a) and 306.

(Verdict Sheet 5-6.)

Special Sentencing Factor #7: The Tybius Flowers Murder

On or about March 1, 2004, in Philadelphia, in the Eastern District of Pennsylvania, the defendants, KABONI SAVAGE and STEVEN NORTHINGTON, knowingly and intentionally murdered, knowingly aided and abetted, and willfully caused the murder of, and aided, agreed, or attempted to aid, and solicited another to commit, the murder of Tybius Flowers, a human being, in violation of the laws of the Commonwealth of Pennsylvania, that is, Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 2502(a) and 306.

(*Id*. at 7.)

The jury made one other finding with respect to Count 1. Specifically, they determined that the following special sentencing factor was not proven as to Defendant:

---

separate counts. (*See* Min. Entry, ECF No. 1443; Savage Sent. Verdict Sheet, ECF No. 1434.) Robert Merritt was found guilty of the RICO conspiracy count, but found not guilty on the remaining counts charged against him. (*Id*.) Because Merritt was acquitted on all of the death-eligible counts, he did not proceed to a sentencing hearing. Kidada Savage was found guilty of RICO conspiracy, six counts of murder in aid of racketeering, retaliating against a witness, and using fire to commit a felony. She was sentenced on February 21, 2014 to the statutory maximum penalty of life imprisonment. (ECF Nos. 1555, 1556.)

Special Sentencing Factor # 2:  The Drug Distribution Conspiracy

From a time at least as early as in or about late 1997 to on or about August 16, 2007, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, the defendants, KABONI SAVAGE, ROBERT MERRITT, STEVEN NORTHINGTON, and KIDADA SAVAGE, knowingly and intentionally conspired and agreed to distribute, and to possess with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), heroin, marijuana, and one kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP); all in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

[As to each defendant, the jury must be unanimous as to whether 5 kilograms or more of cocaine, 280 grams or more of cocaine base ("crack"), 1 kilogram more of PCP, or any combination of those threshold amounts, was involved in conspiracy and foreseeable to that defendant.]

(*Id*. at 2-3.)

After the verdict, Defendant proceeded to the penalty phase of his trial.  On June 13, 2013, the Jury determined that Defendant should be sentenced to life imprisonment without the possibility of release.  (Min. Entry, ECF No. 1465.)  On June 19, 2013, the court imposed that sentence on Defendant.  (Min. Entry, ECF No. 1485; Northington Sent. Verdict Sheet, ECF No. 1488.)

E.	Procedural History

On July 1, 2013, Defendant filed a motion for extension of time to file post-verdict motions.  (ECF No. 1493.)  The Court granted Defendant's motion on July 2, 2013.  (ECF No. 1494.)  The Order stated that Defendant has until ninety days from the date of the Order to file post-verdict motions.  (*Id*.)  On October 2, 2013, which was 92 days after the entry of the Court's order extending the deadline, Defendant filed another motion requesting an extension of time to file post-verdict motions.  (ECF No. 1542.)  The Court granted Defendant's second request for

an extension that same day.  (ECF No. 1543.)  The Order stated that Defendant had thirty days from the date of the Order to file any post-verdict motions.  (*Id.*)

On November 2, 2013, Defendant filed the instant Motion for a New Trial.  (Def.'s Mot., ECF No. 1546.)  On November 22, 2013, the Government filed a response in opposition to the Motion.  (Gov't's Resp., ECF No. 1547.)

## II.    LEGAL STANDARD

Defendant seeks a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Rule 33 permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  When considering a Rule 33 motion, "[t]he court may weigh the evidence, but may set aside the verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice, or if it determines that an error at trial had a substantial influence on the verdict."  *United States v. Parrott*, No. 09-245, 2010 U.S. Dist. LEXIS 20613, at *6 (E.D. Pa. Mar. 4, 2010) (citation omitted).  "A new trial is required on the basis of evidentiary errors only when the 'errors, when combined, so infected the jury's deliberation that they had a substantial influence on the outcome of the trial.'"  *Id.* (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).  Rule 33 Motions should be "granted sparingly and only in exceptional cases."  *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

## III.   DISCUSSION

Defendant makes the following arguments in support of his request for a new trial:

1.       The Court erred by failing to grant Defendant's motion to sever his trial from the trial of his co-Defendants.

2.      The Court erred by failing to grant Defendant's motion to suppress physical evidence seized from 3908 North Franklin Street, Philadelphia, Pennsylvania.

3.      The Court erred by failing to bar the Government from introducing other act evidence pursuant to Federal Rule of Evidence 404(b).

4.      The Court erred by failing to grant Defendant's motion to secure the jury from the county of the offense.

5.      The Court erred by failing to grant Defendant's motion to increase the pool of prospective jurors and to strike the current jury panel.

6.      The Court erred by failing to empanel jurors stricken by the Government, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny.

7.      The Court erred by failing to grant a motion for mistrial relating to the testimony of Government witness, Lamont Lewis.[6]

8.      The Court erred by failing to grant Defendant's motion for a mistrial as a result of a statement made by the Government during its closing argument.

### A.      Denial of Severance Motion

Defendant first argues that he is entitled to a new trial on the basis of the Court's prior ruling denying his request to sever his trial from that of his co-Defendants.  Specifically, Defendant contends that his co-Defendants "were charged with murders which were greater in number, severity, callousness and emotional impact" than the crimes with which Defendant was charged.  (Def.'s Mot. 2-3.)  Defendant is referencing the arson murders of the Coleman family members.  Defendant was not charged with those crimes.  With regard to the arson murders, the

---

[6] Defendant is no longer pursuing this argument in support of his request for a new trial. (Def.'s Mot. 31.)  Defendant indicates that, since "the testimony at issue related to the impact the testimony could have presented in the penalty phase of the trial," the argument is now moot as Defendant was not sentenced to death.  (*Id.*)

jury heard intercepted Title III wiretap recordings, saw disturbing photographs, listened to the fire marshal describe the cause of the victims' deaths, and heard witnesses recount the details of the crime. Defendant contends that the spillover effect of this evidence was so prejudicial that he did not receive a fair trial.

In his pretrial motion seeking severance, Defendant raised precisely the same argument. Defendant argued that a joint trial would have violated his rights because "[t]he alleged acts of the joined co-defendants are so horrific and prejudicial that [he] will not be given the individualized consideration that the Constitution guarantees." (Def.'s Severance Mot. 2.) Focusing on the arson murders, Defendant contended that the evidence would inflame the jury, and thus prevent him from receiving a fair trial and sentencing.

In our December 18, 2012 Memorandum denying Defendant's pretrial severance motion, we determined that a joint trial for this RICO conspiracy case was appropriate. Specifically, we determined that "[t]he fact that the Indictment describes several murders in which Northington did not participate, including the arson murders, does not constitute 'clear and substantial' prejudice that would warrant severance." (Severance Mem. 13.); *United States v. Savage*, No. 07-550, 2012 U.S. Dist. LEXIS 179203, at *23 (E.D. Pa. Nov. 30, 2012) (quoting *United States v. Riley*, 621 F.3d 312, 335 (3d Cir. 2010)). In reaching our conclusion, we found significant the general policy that "[p]articipants in a single conspiracy should ordinarily be tried together for purposes of judicial efficiency and consistency, even if the evidence against one is more damaging than that against another." (Severance Mem. 14); *Savage*, 2012 U.S. Dist. LEXIS 179203, at *26 (quoting *United States v. Ward*, 793 F.2d 551, 556 (3d Cir. 1986)). In our consideration, we relied on the case, *United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991), where the Third Circuit held that the denial of a severance motion was not an abuse of discretion.

The defendants in *Eufrasio* were charged in an overarching RICO conspiracy, but not charged

with their co-Defendants in the murder conspiracy that served as a predicate act to the RICO

count. The Court determined that a joint trial was appropriate because all the criminal acts

charged against the defendants, including the murder conspiracy, were undertaken in furtherance

of the conspiracy, and because "the public interest in judicial economy favored joinder." *Id*. at

568-69. *Eufrasio* applies with equal force to the instant Motion. There has been nothing

presented during the trial or at any other time since we issued our Severance Memorandum that

alters our conclusion that a joint trial was appropriate.

In addition, the jury instructions and the verdict slip make it clear that Northington was

not charged with the arson murders. The Court instructed the jury that they must consider each

charge and each Defendant separately:

> Now, ladies and gentlemen, the defendants, Kaboni Savage, Robert Merritt,
> Steven Northington, and Kidada Savage are charged with a number of offenses.
> Later on, I will explain to you in detail what those offenses are. Before I do that,
> however, I want to emphasize several things.
>
> Ladies and gentlemen, the number of offenses charged is not evidence of guilt.
> This should not influence your decision in any way. Also, in our system of
> justice, guilt or innocence is personal and individual. . . . [Y]ou must separately
> consider the evidence against each defendant on each offense charged, and you
> must return a separate verdict for each defendant for each offense charged.
>
> For each defendant and each offense, you must decide whether the government
> has proven beyond a reasonable doubt that a particular defendant is guilty of a
> particular offense.
>
> You should understand that your decision on any one defendant or any one
> offense, whether guilty or not guilty, should not influence your decision on any
> other defendant or defendants or offense or offenses. Each offense and each
> defendant must be considered separately.

(May 6, 2013 Trial Tr. 41-42, ECF No. 398.) We presume that the jury followed our

instructions. *See United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (noting the

presumption that juries follow the district court's instructions, and "regard such instructions as persuasive evidence that refusals to sever did not prejudice the defendant") (internal citations omitted). We are satisfied that the jury had no problem compartmentalizing the evidence against each Defendant, and that Defendant did not suffer any prejudice from being jointly tried with his co-Defendants.

### B. Denial of Suppression Motion

Defendant also contends that the Court erred by denying his motion to suppress physical evidence seized pursuant to a warrant issued for his residence at 3908 Franklin Street. Specifically, Defendant contends that the evidence seized pursuant to the warrant should have been suppressed because (1) the warrant contains material misrepresentations and omissions, (2) the warrant lacks probable cause, and (3) the good faith exception was not applicable. (Def.'s Mot. 6.)

We briefly recite the facts related to the issuance and execution of the challenged search warrant; however, reference is made to our January 30, 2013 Memorandum for a complete recitation of the facts. (*See* Suppress Mem. 4-5.) On the evening of February 26, 2003, Barry Parker was murdered at the intersection of Franklin and Luzerne Streets, in Philadelphia. At the trial, Lamont Lewis testified that he killed Barry Parker, with Defendant's assistance, and was compensated for the murder by Kaboni Savage. (April 1, 2013 Trial Tr. 160-61, ECF No. 1377.)[7] Detective Kenneth Rossiter of the Philadelphia Police Department ("PPD"), upon responding to the scene of the murder, interviewed two witnesses: Blossom Demonie and Earl

---

[7] The Parker murder was charged as a predicate act for the RICO conspiracy. Defendant was found guilty for both RICO conspiracy and for murder in aid of racketeering for the murder of Parker. In addition, the jury determined that the special sentencing factor related to the Parker murder was proven against Defendant. (Verdict Sheet 5-6.)

Gray.  (Suppress Mem. 4.)[8]  Based on these interviews, Detective Rossiter sought and obtained a search warrant for Defendant's residence.  (Suppress Mem. 5.)  The search warrant application sought articles of clothing, guns, ammunition, and other contraband at 3908 North Franklin Street.  (*Id*.)  The warrant was executed on February 27, 2003.  (*Id*.)  The officers executing the search discovered and seized "multiple firearms, ammunition, cocaine, drug paraphernalia, and other miscellaneous items."  (*Id*.)

Defendant has offered nothing new in this Motion, simply rearguing the same points raised in his pretrial motion to suppress the evidence.  Defendant contends that Detective Rossiter deliberately omitted critical facts from the warrant's affidavit of probable cause, and in doing, mislead the magistrate judge that issued the warrant.  (Def.'s Mot. 7-8.)  Specifically, Defendant contends that Rossiter omitted Gray's statement that the shooter ran in a direction away from 3908 Franklin Street, and Gray's statement that he knew Defendant, and that Defendant was not the shooter.  (*Id*. at 7-8.)  With respect to the direction in which the shooter ran, we addressed this same argument in our January 30, 2013 Memorandum, finding that "there is no evidence that this mistake was more than inadvertent and in any event, it was immaterial."  (Suppress Mem. 8.)  With respect to the omission about Gray not affirmatively identifying Defendant as the shooter, we determined that Defendant misread the warrant application, and that nowhere in the application was Defendant even identified as the shooter.  We further found that "the [magistrate] judge was not misled, and that the witness accounts reflected in the affidavit were sufficient to provide probable cause for issuance of the warrant.  (*Id*. at 9.)

---

[8] Demonie stated that, while walking on Luzerne Street, she observed two males crouched behind a car, one of whom was holding a gun in his hand.  She identified the male holding the gun as "Toot," which is a nickname for Allan Northington, Defendant's brother.  (Suppress Mem. 4.)  She also stated that, after hearing the gun shots, and while standing on the steps of 3916 North Franklin Street, she saw Toot and Defendant run into 3908 North Franklin Street.  (*Id*.)  Gray described to Detective Rossiter the male he witnessed shoot Parker, and that the men headed south on Franklin Street.  (*Id*.)

Finally, we determined that the good faith exception to the exclusionary rule did apply in this instance. Specifically, we found that "given the evidence that Defendant was connected to the murder of Barry Parker, including two witnesses who identified him as being at the scene of the crime . . . the officers' good faith belief that probable cause existed for the search was entirely reasonable." (*Id*. at 10.)

Defendant goes to great lengths in his Motion to explain how damaging the evidence seized at Franklin Street was to his defense. There is no question that the admission of drugs and guns seized pursuant to the warrant and offered at trial was damaging. However, whether he was damaged by the admission of this evidence at trial is not the issue. The issue to be determined is whether Defendant has demonstrated that the search violated his constitutional rights. Defendant has again failed to do so. Defendant's request for a new trial based upon the search and seizure at Franklin Street will be denied.

### C.      Denial of Request to Preclude Rule 404(b) Evidence

Defendant also seeks a new trial on the basis that the Court improperly admitted evidence under Federal Rule of Evidence 404(b). Specifically, Defendant contends that the evidence admitted by the Government was extrinsic as opposed to intrinsic evidence, and therefore was inadmissible under Rule 404(b). The evidence that was admitted related to Defendant's arrest on September 8, 2004 in North Philadelphia.[9] Defendant was arrested on a speeding violation and was found driving with a can of gasoline, latex gloves, and a loaded nine millimeter semi-automatic handgun. (404(b) Mem. 4.) The Government claimed that this evidence was direct proof of the existence and operation of the KSO, and that it was intrinsic evidence of the charged conspiracy, not impermissible prior bad acts evidence under Rule 404(b). Defendant contended

---

[9] A more in-depth factual background about the events leading up to Defendant's arrest is provided in our February 1, 2013 Memorandum. (404(b) Mem. 2-4.)

that the evidence was prejudicial prior bad act evidence since it unfairly created an inference that Defendant was initially the KSO associate charged with carrying out the firebombing of the Coleman residence.

Defendant's arguments in the instant Motion are identical to the arguments in his prior motion seeking to preclude the admission of this evidence. In fact, the section of his Motion addressing this argument appears to be lifted, word for word, from his prior motion. Defendant has added nothing more. His request to exclude this evidence was denied. In our February 1 Memorandum, we determined that the evidence of the circumstances surrounding Defendant's arrest was intrinsic evidence because "that evidence directly proves the charged RICO conspiracy offense." (404(b) Mem. 8.)[10] We concluded that the evidence was relevant and admissible. (404(b) Mem. 9.) We further determined that, even if the evidence was not intrinsic, it would still be admissible under Rule 404(b)(2), which requires that the evidence have a proper evidentiary purpose. (404(b) Mem. 11.) That purpose must be one that is "probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). We found that the evidence surrounding Defendant's arrest served a number of proper evidentiary purposes, including "establishing a relationship between the co-Defendants, the nature and background of the RICO conspiracy, motive for retaliation against Government witnesses and their families, the nature of the plan, and considering that the fire-bombing of this particular witness' home eventually happened in this manner, a distinctive method of operation and absence of mistake." (404(b) Mem. 12.) Finally, we determined that under Rule of Evidence

---

[10] Evidence is "intrinsic" if it directly proves the charged offense, or if it constitutes "'uncharged acts performed contemporaneously with the charged crime' that 'facilitates the commission of the charged crime.'" *United States v. Shelow*, No. 10-0037, 2011 U.S. Dist. LEXIS 141626, at *7 (E.D. Pa. Dec. 9, 2011) (quoting *United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010)).

403, the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice. (*Id*. at 13-14.)

The conclusions we reached in our February 1 Memorandum are equally applicable here. Defendant has failed to establish that the evidence as it was presented at trial was extrinsic, irrelevant, or was unfairly prejudicial to him. There has been no miscarriage of justice as a result of this evidence being admitted at trial. Defendant's request for a mistrial on this basis will be denied.

### D. Denial of Motion to Secure Jury from County of Offense

Next, Defendant argues that a new trial is warranted because he was entitled to a jury composed of residents from Philadelphia County. Specifically, Defendant claims that because Defendants were Philadelphia residents, because most of the crimes occurred in Philadelphia, and because most of the law enforcement officials were members of the Philadelphia Police Department, Defendants should have been "judged by their urban peers." (Def.'s Mot. 24.) As is done in all cases tried in the Eastern District of Pennsylvania, prospective jurors were selected randomly from a jury wheel composed of lists of registered voters from each of the nine counties comprising the District. Defendant concedes that his argument was already raised and rejected by the Court prior to trial. (*Id*.) Nevertheless, he proceeds, in the face of our denial, to contend that the Court should have requested county-specific prospective juror lists from the Commonwealth of Pennsylvania and used these lists in creating the prospective juror panels for his case.

In our October 2, 2012 Memorandum denying Defendant's request to secure a jury from Philadelphia County, we explained in detail the procedure utilized by the Eastern District of Pennsylvania to summons prospective jurors. (County Mem. 6 n.6.); *United States v. Savage*,

No. 07-550, 2012 U.S. Dist. LEXIS 142844, at *10 n.6 (E.D. Pa. Oct. 2, 2012).  We also

determined that "[n]ot only is there no statutory right to a jury from the county of offense, there

is no explicit right to empanel such a jury in the Constitution." (County Mem. 4); *Savage*, 2012

U.S. Dist. LEXIS 142844, at *7 (citing *United States v. Zicarelli*, 543 F.2d 466, 477 (3d Cir.

1976) ("[T]he concept that a criminal trial must be before a jury composed of residents of the

county where the crime occurred was not deemed to be of sufficient consequence to be

guaranteed by the Constitution.")). Similarly, we determined that the process by which the

Eastern District of Pennsylvania summonses prospective jurors does not run afoul of the Sixth

Amendment or the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861, *et seq.* (County

Mem. 5-8); *Savage*, 2012 U.S. Dist. LEXIS 142844, at *8-13.

Defendant cites to no authority supporting his argument, nor has he alleged any

constitutional deprivation that resulted from the selection of the jury in this case. There has been

no miscarriage of justice here. Defendant's request for a mistrial is denied.

### E. Denial of Motion to Increase Pool of Prospective Jurors and Strike Current Jury Panel

Next, Defendant argues that he is entitled to a new trial because the Court wrongly denied

his pretrial motion to increase the pool of prospective jurors and strike the jury panel. Defendant

contends that the Eastern District of Pennsylvania's use of voter registration lists from the nine

counties that comprise the District dilutes the pool of prospective minority jurors. As a result,

Defendant contends that he was deprived of his Sixth Amendment right to be tried by a

representative cross section of the community and was denied a fair trial. (Def.'s Mot. 25.)

Specifically, Defendant claims that the prospective jury pool in this case underrepresented both

individuals residing in Philadelphia and African Americans. Defendant claims that to remedy

this disparity, the Court should have requested a broader list of prospective jurors maintained by

18

the Administrate Office of the Pennsylvania Courts ("AOPC"). The AOPC's list was allegedly created using voter registration roles, driving license records, Department of Public Welfare records, and the Department of Revenue property tax records. Defendant relies on statistics derived from United States Census Bureau data.

"'The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community.'" *United States v. Green*, 507 F. App'x 239, 241 (3d Cir. 2012) (quoting *Berghuis v. Smith*, 559 U.S. 314, 319 (2010)). To establish a violation of the fair cross-section requirement, a defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *United States v. Weaver*, 267 F.3d 231, 237 (3d Cir. 2001).

Defendant's arguments suffer from the same deficiencies as did his arguments in his pretrial motion requesting the same relief. In our January 28, 2013 Memorandum, we determined that African-Americans are a cognizable or distinctive group, satisfying the first element of the *Duren* test. (Juror Mem. 8.) However, we also determined that Philadelphians were not a cognizable group because Defendant failed to show "how Philadelphians are distinct and culturally different from those residing in the other eight counties making up the Eastern District." (*Id*. at 7 (citing cases)); *see also Zicarelli v. Dietz*, 633 F.2d 312, 320 (3d Cir. 1980) (holding that residents of a geographic group cannot be considered a distinctive group for cross-section analysis unless the group is "profoundly culturally distinct"). With respect to the second

*Duren* factor—the representation of African Americans in venires from which juries are selected is not fair and reasonable in relation to the number of African Americans in the community—we determined that, based upon an analysis considering both the absolute and comparative disparities between the alleged underrepresented group on the jury wheel[11] and those in the general population, Defendant failed to meet his burden. (Juror Mem. 10-12.)

Addressing the third factor, we pointed out that Defendant had not even attempted to establish that the underrepresentation of African Americans was the result of a systematic exclusion of this group in the jury selection process. (*Id*. at 13.) The same is true with respect to the instant Motion for a new trial. Defendant merely relies on statistics derived from census data, and offers nothing more to demonstrate that the underrepresentation of African Americans is due to a systematic exclusion of this group in the jury selection process. "The *Duren* test looks not just to the jury venire in the [defendant's] individual case but rather to a pattern or history of jury venires from which valid statistical inferences might be drawn." *Bridges v. Beard*, 941 F. Supp. 2d 584, 646 (E.D. Pa. 2013) (rejecting cross-section claim where the habeas petitioner failed to put forth any historical statistical analysis showing an underrepresentation). This deficiency is fatal to Defendant's cross-section claim. *See Green*, 507 F. App'x at 241 (affirming district court's denial of Sixth Amendment fair cross section claim where the Defendant put forth no evidence demonstrating that African-Americans are systematically excluded from serving on the juries); *United States v. Murphy*, 464 F. App'x 60, 63 (3d Cir. 2012) (noting that the defendant's mere reliance on census data from the various counties within the district was "plainly insufficient" to satisfy the *Duren* test); *United States v. Smith*, 247 F.

---

[11] The master jury wheel is created pursuant to the Jury Plan of the Eastern District of Pennsylvania, and consists of a random selection of individuals from lists of registered voters from each of the nine counties. Master jury wheels are repopulated every two years. In our January 28 Memorandum, we evaluated Defendant's claims using numbers from the 2011 Master Jury Wheel. (Juror Mem. 9.)

App'x 321, 323 (3d Cir. 2007) (rejecting challenge to jury composition where the defendant failed to present "competent statistical evidence" that is "based on an examination of the jury selection practices in a district over a prolonged period of time"). Defendant's request for a new trial based upon the make-up of the jury pool will be denied.

### F. Overruling of *Batson* Challenges to Stricken Jurors

Defendant next argues that the Court erred by failing to empanel jurors stricken by the Government, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. (Def.'s Mot. 28.) Defendant contends that juror numbers 185 and 364, both African-Americans, were qualified, and were improperly excluded from the jury panel as a result of peremptory strikes exercised by the Government.

In *Batson*, the Supreme Court held that, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." 476 U.S. at 89. Pursuant to *Batson*, there is a three-part test to determine whether the peremptory strike offends Equal Protection:

> First, the defendant must make out a *prima facie* case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a *prima facie* case, the burden shifts to the [Government] to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, [i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 83-84).

With regard to the first step in the analysis, "[a] *prima facie* case will be found if, after considering the facts and all relevant circumstances, the evidence is sufficient to permit the trial judge to draw an inference that discrimination has occurred in the prosecutor's exercise of peremptory challenges." *Lewis v. Horn*, 581 F.3d 92, 103 (3d Cir. 2009) (internal quotation

marks omitted). However, "the question of whether a prima facie case has been established becomes moot, and thus need not even be addressed, when the prosecutor provides explanations for the strikes . . . ." *Holloway v. Horn*, 355 F.3d 707, 723 (3d Cir. 2004); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").

The Supreme Court sets a relatively low bar with respect to the Government's burden at the second step in the *Batson* analysis—providing a race-neutral justification for the strike. *Hardcastle v. Horn*, 368 F.3d 246, 257 (3d Cir. 2004). The Third Circuit has explained:

> Indeed, the second step of the *Batson* analysis does not demand an explanation that is persuasive or even plausible. Rather, the sole issue at step two is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

*Id.* (internal quotations and citations omitted). However, the Government must present "reasons, not merely a denial of discriminatory motive." *Id.* at 258. Those reasons must be "'clear and reasonably specific,'" and not based on "mere 'good faith' or 'intuition.'" *United States v. Casper*, 956 F.2d 416, 418 (3d Cir. 1992) (quoting *Batson*, 476 U.S. at 98 & n.20).

In the third step of the *Batson* analysis, "the court must . . . determine whether the defendant has carried his burden of proving purposeful discrimination." *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008). "The burden at this step . . . is to show that it is more likely than not that the prosecutor struck at least one juror because of race." *Id.* Even at this step, "the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike." *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 338 (2006)).

In considering a *Batson* challenge, the Third Circuit advised that "[a] trial court should look to all of the evidence and surrounding circumstances, including the context in which strikes were exercised, to determine whether the prosecutor's proffered reasons for striking a juror are pretextual and whether the defendant has shown that the prosecutor had a discriminatory intent." *Coombs v. Diguglielmo*, 616 F.3d 255, 261-62 (3d Cir. 2010). Courts also evaluate the "prosecutor's state of mind based on demeanor and credibility . . . ." *United States v. Andujar*, 209 F. App'x 162, 168 (3d Cir. 2006) (quoting *Hernandez*, 500 U.S. at 365); *see also United States v. Baskerville*, 448 F. App'x 243, 247 (3d Cir. 2011) (noting that trial judges are "best-positioned to evaluate the credibility of prosecutors' race-neutral explanations").

      *1.*    *Juror Number 185*

Individual *voir dire* of Juror Number 185 took place on November 15, 2012. (*See* Nov. 15, 2012 Trial Tr. 211, ECF No. 721 (filed under seal).) The juror was a 31-year old African-American female who lived in North Philadelphia. (Juror # 185 Questionnaire 7-8 (on file with Court).) She indicated that she was unemployed, and was actively seeking part-time work because she planned to return to school. (*Id*. at 10; Nov. 15 Trial Tr. 215.) She was seeking a job that would allow her to work evening shifts, from approximately 7-11 p.m. She indicated a neutral and unbiased position with respect to the death penalty, stating that she could render a verdict of death based on the facts of the case and the crime, and under the appropriate circumstances. (Nov. 15 Trial Tr. 213, 219-221.) The Government exercised a peremptory challenge and struck Juror Number 185. (*Id*. at 229.) Counsel for Defendant Merritt requested a sidebar conference and raised a *Batson* challenge to the Government's use of a strike on this juror. (*Id*.) All Defendants joined in the challenge. (*Id*.)

Defendant concedes that, at the time Juror Number 185 was stuck, there had been "an insufficient pattern of racially motivated peremptory challenges exercised by the Government." (Def.'s Mot. 30.) However, he seems to suggest that, after juror number 364 was stricken, a sufficient pattern was established, thus reviving the *Batson* challenge to Juror number 185. Defendant offers no substantive argument as to why striking Juror Number 185 constitutes a *Batson* violation, except to say that she was African-American and was acceptable to all Defendants. Defendant's argument is not sufficient to meet a prima facie case. Even assuming, however, that Defendant was able to make out a prima facie case, his challenge with respect to Juror Number 185 fails at step two of the *Batson* analysis.

The Government offered two reasons for exercising a peremptory strike on Juror Number 185. First, the Government stated that it struck the juror because she was unemployed, was actively seeking a job, and was looking for a position where she could work night shifts. The Government was primarily concerned with the fact that the juror would have little time to seek employment as she would be in court all day long. Another concern was that, if the juror was successful in securing night shift work, the resulting schedule would be burdensome and not "conducive" to serving on a jury where she would have been required to pay attention all day long. This is a legitimate, race-neutral, explanation for use of a peremptory strike. *See United States v. Walker*, 479 F. App'x 329, 331 (11th Cir. 2012) (noting that the fact that a prospective juror was unemployed was a race-neutral and legitimate reason for exercising a peremptory strike). Second, the Government had concerns about the juror's residency—North Philadelphia—in light of the circumstances of this case. Specifically, the Government stated the case involved witness intimidation, and that, in light of the approximately 200-250 witnesses that were slated to testify, many of whom were from North Philadelphia and would be testifying

about events that took place in North Philadelphia, there was a concern about the juror's safety. This is also a legitimate, race-neutral, explanation for striking Jury Number 185. *See Perez v. Smith*, 791 F. Supp. 2d 291, 306 (E.D.N.Y. 2011) (determining that the prosecutor's proffered reason for exercising a preemptory challenge—namely, the juror's "overfamiliarity with the area where the crime was committed" due to his residence there—was valid and race-neutral). Based upon all of the circumstances, including the fact that, prior to this strike, an African-American juror had already been empaneled, and taking into account the prosecutor's demeanor and credibility, we are satisfied that the Government's reason for striking the juror was not pretextual and not in any way motivated by a discriminatory intent.

2.        *Juror Number 364*

Individual *voir dire* of Juror Number 364 took place on December 5, 2012. (*See* Dec. 5, 2012 Trial Tr. 117.) This juror was a 46-year old African-American female who lived in Philadelphia. (Juror # 364 Questionnaire 7-8 (on file with Court).) She indicated that she was "not a big supporter" of the death penalty, but that she believed it "may be warranted" in certain circumstances. (Dec. 5 Trial Tr. 122-23.) The juror questionnaire asks for jurors to select a number from one to ten that "best reflects [their] overall opinion regarding the death penalty, with '1' being strongly opposed and '10' being strongly in favor." (Juror #364 Questionnaire 50.) Juror Number 364 selected a rating of 3. (*Id*.) When asked on the questionnaire what, in general, her views on the death penalty were, she indicated that "[i]t should be considered only in the most extreme cases." (*Id*. at 49.) Question 58 on the juror questionnaire asks the following: "[h]ave you, a family member, or anyone close to you, ever been the victim of or a witness to a crime, whether or not that crime was reported to law enforcement?" (*Id*. at 24.) Juror Number 364 responded yes, and indicted that her son was a victim of a shooting. (*Id*; Dec. 5 Trial Tr.

127-30.)  During individual *voir dire*, the juror became emotional when discussing the incident, but elaborated by indicating that, in 2007, her son was shot three times in his car in Philadelphia, that he survived, and that the offender was never caught.  (Dec. 5 Trial Tr. 127-28.)  The juror also expressed that she believed that the case was not given sufficient attention by the Philadelphia Police Department, but that she didn't believe that the incident would affect her role as a juror in this case.  (*Id*. at 136.)  Juror Number 364 also indicated that she visited her boyfriend in jail when he was awaiting trial on assault charges that were later dropped.  (*Id*. at 138-39.)  The Government exercised a peremptory challenge and struck Juror Number 364.  (*Id*. at 146.)  Counsel for Defendant Merritt raised a *Batson* challenge to the Government's use of a strike on this juror.  (*Id*.)  All Defendants joined in the challenge.

The Government offered many reasons for their decision to exercise a peremptory strike. First, the Government stated that she was not "death qualified" because she was not a "big supporter" of the death penalty, and rated herself as 3 out of 10 in her support for the death penalty on her jury questionnaire.  (Dec. 5 Trial Tr. 146; *see also* Gov't's Resp. 19.)  In addition, the Government was concerned that the facts surrounding her son getting shot inside of a car were strikingly similar to the facts surrounding the murder of Tybius Flowers, a crime charged in the case.  (Dec. 5 Trial Tr. 146-57; *see also* Gov't's Resp. 19.)  Moreover, the juror believed that the police did not thoroughly investigate her son's shooting.  (Dec. 5. Trial Tr. 147.)  The Government was also concerned that the victim had visited her boyfriend in jail after he was charged with assault, and "maintained a relationship with him after he was charged with that violent offense."  (Gov't's Resp. 19; *see also* Dec. 5 Trial Tr. 146.)

The Court took the matter under advisement, and excused Juror Number 364 for the day, requesting that she return the following week.  The juror returned on December 12, 2012.  At

that time, the Court denied Defendants' *Batson* challenge, stating the reasons on the record. The Court determined that the reasons proffered by the Government were race neutral, and credible. (Dec. 12 Trial Tr. 5.) The Court also determined that there was no pattern of discrimination shown by the strikes exercised by the Government. (*Id.*)

Defendant now claims, with very little substantive argument to support him, that the Government used a peremptory challenge on Juror Number 364 "for no apparent justifiable reason." (Def.'s Mot. 30.) Defendant further argues that a prima facie case under *Duren* is established because the Government exercised two other peremptory challenges on qualified African-American jurors. Finally, Defendant contends that the reasons proffered by the Government were not race neutral.

Defendant's argument is meritless. We addressed Defendant's challenges to Juror 364 on the record during *voir dire* on December 12th. We stated that the reasons articulated by the Government for striking this juror are entirely race-neutral. That is equally true now. *See Waddy v. Lawler*, No. 08-286, 2008 U.S. Dist. LEXIS 117134, at *30-31 (E.D. Pa. Oct. 29, 2008) ("Further, the bases given -- that a close family member had been convicted of a crime or had a negative encounter with the police, that the individual was familiar with the defendants' neighborhood, or that a pastor/counselor might be reluctant to impose the death penalty -- do not strike us as illegitimate."). Based upon all of the circumstances, including the fact that, prior to this strike, two African-American jurors had already been empaneled, and taking into account the prosecutor's demeanor and credibility, we are satisfied that the Government's reasons for striking the juror were not pretextual, and not in any way motivated by a discriminatory intent. Defendant's request for a new trial based on *Batson* challenges will be denied.

### G. Denial of Motion for Mistrial Based on Government's Statement During Closing Argument

Finally, Defendant argues that the Court erred by failing to grant a mistrial as a result of a statement made by the Government during its closing argument. (Def.'s Mot. 31-33.) At the close of the summation, one of the prosecutors stated, in relation to the arson murders:

> But there would be no rescues that night. When the firefighters arrived within minutes of Robert Merritt tossing those gas cans, the house was fully engulfed in flames. Joe Finley told you, he rarely saw a house that was this bad. As Joe Finley's partner knocked down the flames with the fire hose, just enough so Joe could get into that house and make an entry, the whole living room was glowing orange, an image of hell on earth. The family's pet dog looked up at Joe, he was all burned up, but it was still alive. And this was before Joe got upstairs to where the people were trapped and where they were cooked in place.
>
> They did this, ladies and gentlemen. They did this. In their final successful act of violence, the defendants in the courtroom did these things. They targeted and they murdered the family of Eugene Coleman. These victims, they are not drug dealers. They are three generations of mothers and children. Mr. Savage, there was no rats in that home on October 8th and 9th. There was no rats in the home that he and Kidada Savage and Robert Merritt and Lamont Lewis burned down. There was a well-loved grandmother named Marcella Coleman. There was a devoted mother named Tameka Nash. But there was no rats in that house. And there was no chicken wings in that house either. There was a smart and athletic 15-year old boy named Sean Rodriguez. There was a friendly and generous 12-year old boy named Tajh Porchea. There was a precious and self-assured ten-year old girl named Khadijah Nash, but there was no chicken wings in that house. And neither was there any mice in that house. There was a sweet and happy 15-month old baby boy named Damir, but there was no mice in that house. There were six beautiful, healthy, loving people in that house and you killed them. You killed them, and you killed them, and you killed them.

(April 30, 2013 Trial Tr. 52-53.)[12] Defendant claims that the prosecutor pointed to each of the four Defendants when he stated, "you killed them . . . . [y]ou killed them, and you killed them, and you killed them." (Def.'s Mot. 33.) Counsel for Defendant immediately lodged an objection to the prosecutor's comments and actions, stating "we are not charged with that arson." (April

---

[12] The Government's reference to "rats" and "mice" refer to statements made by Kaboni Savage that were heard by the jury by way of intercepted Title III recordings. In this context, the term "rat" is a derogatory term used to describe a Government cooperator and "mouse" or "mice" are used to refer to children of the cooperator.

30 Trial Tr. 54.)  The prosecutor responded, stating that he "was not pointing to Mr.

Northington."  (*Id*.)  The prosecutor then proceeded to tell the jury, "[y]ou know who killed

them:  Kaboni Savage, Kidada Savage, Robert Merritt, and Lamont Lewis."  (*Id*.)

After the Government completed their closing argument, counsel for Defendant requested

a sidebar and moved for a mistrial.  (*Id*. at 55.)  The court denied Defendant's request for a

mistrial, but stated that the jury will again be instructed that Defendant is not charged with the

arson murders.  (*Id*.)  The Court then instructed the jury:

> Ladies and gentlemen, you should understand that Steven Northington is not
> charged with any of the Coleman arson murders. . . .  He is not charged with those
> crimes."

(*Id*. at 57.)

Defendant objects specifically to the two underlined portions of the Government's

closing statement.  Defendant contends that these statements were made "intentionally . . . to

inflame the jury," and that since he was not charged with the arson murders, the statements had

the effect of "improperly and deliberately fram[ing] Northington within the portrait of the

firebombers in an intentional effort to turn the jury against him . . . ."  (Def.'s Mot. 33.)

Defendant argues that the result was incalculable damage to him requiring a mistrial.  (*Id*.)

A showing of prosecutorial misconduct may warrant a new trial under Rule 33.  *United

States v. Bianchi*, 594 F. Supp. 2d 532, 538 (E.D. Pa. 2009) (citing *United States v. Dixon*, 658

F.2d 181, 193 (3d Cir. 1981)).  "Improper argument by a prosecutor violates the Constitution if it

renders a trial so fundamentally unfair as to deny a defendant due process."  *United States v.

Brodie*, 268 F. Supp. 2d 420, 424 (E.D. Pa. 2003).  In considering whether the prosecutor's

misconduct caused prejudice, courts consider three factors:  (1) "the scope of the comments in

the overall trial context"; (2) "the effect of any curative instructions given"; and (3) "the strength

of the evidence against the defendant." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999); *see also Brodie*, 268 F. Supp. 2d at 424-45.

We are satisfied that Defendant did not suffer any prejudice from the Government's closing argument. The prosecutor's statement, "you did it," contemporaneous with his pointing towards Defendant, was an inadvertent mistake. Immediately after the mistake was made, the prosecutor corrected himself by advising the jury that he was not pointing to Defendant, and reiterating that Kaboni Savage, Kidada Savage, Robert Merritt, and Lamont Lewis killed the Coleman family members, and that Northington did not kill them. Defendant was neither charged with, nor convicted of the arson murders. The Court immediately gave a curative instruction to the jurors advising them that Defendant was not charged with the Coleman arson murders. The evidence presented at trial was sufficient to convict Defendant of the crimes with which he was charged: RICO conspiracy and murder in aid of racketeering for the murders of Barry Parker and Tybius Flowers. Defendant's request for a new trial based upon the prosecution's closing statement will be denied.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Steven Northington's Motion for a New Trial will be denied.

An appropriate Order will follow.


**BY THE COURT:**


***/s/R. Barclay Surrick***
**U.S. District Judge**